IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ELSA MARIA RODRIGUEZ, | ) | Case No. 1:23-CV-01305 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| v. | ) | |
| | ) | |
| COMMISSIONER OF | ) | **MEMORANDUM OPINION AND** |
| SOCIAL SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

**I.    Introduction**

Plaintiff, Elsa Maria Rodriguez ("Rodriguez"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c)(1). I find the Administrative Law Judge ("ALJ") did not apply the proper legal standards and reached a decision that is not supported by substantial evidence, and vacate and remand the Commissioner's final decision denying Rodriguez's DIB application.

**II.    Procedural History**

Rodriguez filed for DIB on November 9, 2018, alleging an amended disability onset date of April 21, 2017. (Tr. 170-78, 195). The claims were denied initially and on reconsideration. (Tr. 81, 90). She then requested a hearing before an ALJ. (Tr. 115-16). The ALJ issued a written opinion on October 7, 2019, finding Rodriguez not disabled. (Tr. 15-25). The Appeals Council

denied her request for review on August 19, 2020, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981).

Rodriguez appealed the ALJ's decision to the U.S. District Court for the Northern District of Ohio. The District Court reversed the Commissioner's decision and remanded the case to the ALJ. (Tr. 634). On remand, Rodriguez and a vocational expert ("VE") testified before the ALJ on April 4, 2023. (Tr. 585-609).

On April 28, 2023, the ALJ issued a written decision finding Rodriguez not disabled. (Tr. 562-84). As the case had previously been remanded by the District Court, the hearing decision is the final decision of the Commissioner. (Tr. 634; *see* 20 C.F.R. § 404.984). Rodriguez timely filed this action on June 30, 2023. (ECF Doc. 1).

**III.      Evidence**

    **A.      Personal, Educational, and Vocational Evidence**

Rodriguez was 54 years old on the date last insured, making her an individual closely approaching advanced age according to Agency regulations. (*See* Tr. 576). She attended school through the ninth grade. (*See* Tr. 201, 594). She has worked as a small product assembler, hotel housekeeper, and laundry aide. (Tr. 201, 595-96).

    **B.      Relevant Medical Evidence[1]**

On April 21, 2017, Rodriguez reestablished care with her primary care physician, Leonor Osario, D.O. (Tr. 310). Rodriguez's chief complaints were anxiety and depression. (*Id.*). Rodriguez explained that her husband died four months prior to her visit and that she was having a difficult time with grief. (*Id.*). She felt very anxious and would overeat. (*Id.*). Rodriguez had no

---

[1] This recitation of the medical evidence is limited to evidence relevant to Rodriguez's challenge to the ALJ's findings regarding her mental health impairments, all other claims are deemed waived. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003).

suicidal ideations and was negative for sleep disturbance, mood disorder, and recent psychosocial stressors. (*Id.*). Dr. Osario informed Rodriguez about the importance of exercising and decreasing her coffee intake to help with her anxiety. (Tr. 311). Dr. Osario prescribed Lexapro and recommended a psychological consultation. (*Id.*).

On August 15, 2017, Rodriguez had an appointment with Dr. Osario for pain in her back. (Tr. 303-04). During this appointment, Rodriguez reported that she was depressed but did not have any suicidal or homicidal ideations. (Tr. 304). She complained that she did not have energy and was overeating. (*Id.*). Rodriguez was alert and cooperative during her appointment. (*Id.*). Dr. Osario increased Rodriguez's Lexapro prescription to 20 mg per day. (Tr. 305).

On December 7, 2017, Rodriguez attended a follow up appointment with Dr. Osario for weight management. (Tr. 293). Dr. Osario encouraged Rodriguez to write in a journal and meditate rather than eat for stress relief. (Tr. 294).

Rodriguez saw Ilda Felix, CNP, on April 3, 2018. (Tr. 289). Rodriguez came to the appointment with her daughter, who reported that Rodriguez was depressed and in denial after her husband's death. (*Id.*). Rodriguez would lose her patience which affected her family. (*Id.*). CNP Felix noted that Rodriguez was negative for sleep disturbance, mood disorder, and recent psychosocial stressors. (Tr. 291). CNP Felix referred Rodriguez to a consultation with psychology for her depression and anxiety and instructed Rodriguez to continue taking Lexapro for depression. CNP Felix prescribed Buspirone for anxiety. (*Id.*).

On May 9, 2018, Rodriguez saw Dr. Osorio, reporting that she was still experiencing depression. (Tr. 286-87). Rodriguez was alert and cooperative with no signs of distress during the appointment. (Tr. 287). Dr. Osario instructed Rodriguez to continue taking her Lexapro. (*Id.*).

On August 10, 2018, Rodriguez had a consultation with Dr. Osorio for right carpal tunnel release. (Tr. 267). During the appointment, Rodriguez was alert and oriented, with no acute distress. (Tr. 269). Dr. Osario noted that Rodriguez was "somewhat stable" regarding her anxiety and depression with medication, but that Rodriguez would like to increase her dosage. (*Id.*). The notes from this encounter indicate that Rodriguez was taking her Lexapro, but on August 7, 2018, she reported she was not taking her Buspirone. (Tr. 268-69).

On August 30, 2018, Rodriguez saw Dr. Osorio for a follow up regarding her depression. (Tr. 265-66). Rodriguez reported having good days and bad days, noting that her family was an active stressor. (*Id.*). She reported being medication compliant with no suicidal or homicidal ideations. (Tr. 266). During the appointment, Rodriguez was alert and cooperative with no signs of distress. (*Id.*). Dr. Osario noted that Rodriguez was negative for sleep disturbance, mood disorder, and recent psychosocial stressors. (*Id.*). Rodriguez was informed that counseling, journal writing, and exercise would help with depression. (*Id.*). Dr. Osario recommended that Rodriguez consult with psychiatry. (*Id.*).

On September 28, 2018, Rodriguez went to the emergency room due to increased depression. (Tr. 257). Rodriguez was described as tearful, nervous, and anxious during the visit. (Tr. 257, 259). Rodriguez reported problems with her daughter which caused her to feel overwhelmed and more depressed. (Tr. 257). She denied suicidal and homicidal ideations but had passive death wishing thoughts. (Tr. 257, 261). Rodriguez reported palpitations, dizziness, and a headache. (Tr. 258). Rodriguez stated she was compliant with her medication; however, she did not take her psychiatric medications that day. (*Id.*).

Emma Borrelli, LPC, conducted a behavioral health intake with Rodriguez during her emergency room visit. (Tr. 261). Rodriguez was calm and cooperative during the assessment.

4

(*Id.*). She answered questions appropriately, but with a flat affect. (*Id.*). Rodriguez reported that she did not have a support system, but that she was comfortable talking to two of her children. (Tr. 261). Rodriguez declined admission into a mood behavioral unit because she feared it would interfere with her ability to see her grandson. (Tr. 260-61). At discharge, Rodriguez's disposition was stable. (Tr. 261).

On November 16, 2018, Rodriguez saw Yaritza Colon, LISW-S for an initial evaluation, seeking treatment for increased depressed mood, anxiety, and grief. (Tr. 405-06). Rodriguez's chief complaint at this visit was "'Every [] time I think of my husband I start crying.'" (Tr. 406). Rodriguez reported feeling overwhelmed by her symptoms, chronic tearfulness, low mood and energy, decreased interests, increased apathy and appetite, and feeling alone. (*Id.*). Rodriguez preferred to stay in bed all day, but also reported that her sleep was poor making her feel tired daily. (*Id.*). Rodriguez reported chronic worry and ruminating thoughts. (*Id.*). She denied having suicidal ideations but admitted to fleeting death wishes. (*Id.*). She felt guilty about her mood swings and lashing out at her children. (*Id.*). She also reported low energy with fluctuating concentration. (*Id.*). While Rodriguez had been taking Lexapro for two years, she did not feel as though it adequately treated her symptoms. (Tr. 407). Colon administered the PHQ-9 and the GAD-7, which Rodriguez scored 25 and 13 respectively, indicating moderate to severe symptoms of depression and anxiety. (*Id.*).

On December 13, 2018, Rodriguez saw Dr. Osario for a follow up. (Tr. 1069). Rodriguez reported that her depression had improved but was still present. (*Id.*). Rodriguez informed Dr. Osario that she had an appointment with her psychiatrist scheduled for the following week to discuss her medication dosage. (*Id.*).

5

### C. Medical Opinion Evidence

On December 2, 2018, state Agency reviewer Janet Souder, Psy.D., evaluated Rodriguez's medical record and determined there was insufficient evidence to assess Rodriguez's mental health condition on initial review. (Tr. 77-78). On reconsideration, Vicki Warren, Ph.D. found the same and affirmed Dr. Souder's findings on January 8, 2019. (Tr. 86-87).

### D. Administrative Hearing Evidence

At the hearing before the ALJ on April 4, 2023, Rodriguez testified that following an accident in 2012, she did not work and stayed home with her husband who took care of her. (Tr. 597). Rodriguez's husband died in 2016. (*Id.*). Following her husband's death, Rodriguez became severely depressed and began seeing a psychologist and a psychiatrist for her depression. (*Id.*). As a result of her depression, Rodriguez does not go out often unless she is accompanied by her daughter. (*Id.*). The fact that she cannot go out makes Rodriguez more depressed. (*Id.*).

Rodriguez takes medication to deal with her depression and anxiety. (Tr. 598). Rodriguez has difficulty talking with her psychologist and psychiatrist because she gets anxious during their phone calls and begins crying. When this happens, Rodriguez postpones the call. (*Id.*).

A few years after her husband's death, Rodriguez's father and sister died. (Tr. 602). Rodriguez explained that it felt like it was one thing after another. (*Id.*). These subsequent family deaths made Rodriguez feel worse and want to stay home. (*Id.*). Rodriguez felt more anxiety as a result of the pandemic. (Tr. 603).

The VE testified at the hearing. (Tr. 605-07). He testified that a hypothetical individual of Rodriguez's age, education, and work history, limited to light exertion who can handle and finger items frequently bilaterally; frequently climb ramps and stairs but never climb ladders,

6

ropes, or scaffolds; and frequently stoop, kneel, crouch, and crawl, would be able to perform Rodriguez's past work as a small product assembler and hotel housekeeper, but not as a laundry aide. (Tr. 606). The VE noted however, that Rodriguez may not be able to perform hotel cleaning based on the constant use of her hands. (*Id.*).

He further opined such an individual could also perform the jobs of a marker, DOT 209.587-034, SVP 2, light exertion level, with 56,000 jobs in the national economy; garment sorter, DOT 222.687-014, SVP2, light exertion level, with 23,000 jobs in the national economy; and laundry classifier, DOT 361.687-014, SVP 2, light exertion level, with 21,000 jobs in the national economy. (Tr. 606).

As for time off-task or absenteeism, the VE testified that employers would generally tolerate no more than 10% of the time off-task and no more than one absence per month. (Tr. 607).

### IV.  The ALJ's Decision

In his decision, the ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2018.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date through her date last insured of June 30, 2018 (20 CFR 404.1571 *et seq.*).

3. T[h]rough the date last insured, the claimant had the following severe impairments: left elbow epicondylitis; lumbar radiculopathy; carpal tunnel syndrome status-post right carpal tunnel release surgery; and obesity (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that et or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform

7

      light work as defined in 20 CFR 404.1567(b) except frequently climb ramps and stairs; never climb ladders, ropes or scaffolds; frequently stoop, kneel, crouch and crawl; and frequently handle and finger bilaterally.

6. Through the date last insured, the claimant was capable of performing past relevant work as small products assembler and hotel housekeeper. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from the alleged onset date, through June 30, 2018, the date last insured (20 CFR 404.1520(f)).

(Tr. 570-77).

## V. Law & Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

8

B. **Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review

9

decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI. Discussion

Rodriguez assigns the following error for this Court's review: "the ALJ erred by assessing Plaintiff's mental impairments as non-severe at step two and the ALJ's error permeate the remainder of the decision and Plaintiff's RFC." (ECF Doc. 11, PageID 2014).

### A. The ALJ erred in failing to explain or consider Rodriguez's mental impairments when determining her RFC.

Rodriguez argues the ALJ erred when he determined that her mental impairments were non-severe because her medical records demonstrate that her mental limitations meet Step Two's *de minimis* hurdle. (ECF Doc. 11, PageID 2025). For example, Rodriguez points to her November 16, 2018 appointment with LISW-S Colon where she scored 25 on the PHQ-9 and 13 and on the GAD-7. (*Id.*). In support of her argument, Rodriguez cites *Pearson v. Comm'r of Soc. Sec.*, No. 19-13506, 2020 WL 8266422, (E.D.Mich., 2020) for the proposition that the PHQ-9 is recognized by the Sixth Circuit as a reliable source when determining the severity of a claimant's depression. (ECF Doc. 11, PageID 2025). Rodriguez further argues that the ALJ failed to consider her mental impairments – regardless of severity – when he determined her RFC. (*Id.* at PageID 2027).

10

In response, the Commissioner argues that the ALJ did not err because based on the "limited record, the ALJ reasonably concluded that the evidence did not establish more than a minimal limitation in [Rodriguez's] ability to do basic work activities through her date last insured." (ECF Doc. 13, PageID 2036). Further, the Commissioner notes that Rodriguez "relies entirely on medical records that, at the earliest, post-date [her] June 30, 2018 date last insured by several months." (*Id.*).

I find that the record suggests that Rodriguez's depression and anxiety had more than a minimal effect on her ability to work at Step Two of the sequential five-step analysis. I further find that the ALJ erred in failing to adequately explain why Rodriguez's mental impairments did not result in work-related limitations.

At Step Two, the ALJ considers the medical severity of a claimant's impairment and whether there is a severe medically determinable physical or mental impairment – or combination of impairments – that meets Agency duration requirements. 20 C.F.R. § 404.1520(a)(4)(ii). Generally, agency regulations provide that finding no limitations or only mild limitations result in finding a limitation to be non-severe. *See* 20 C.F.R. § 404.1520a(d)(1). An impairment or combination of impairments is non-severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." *Id.* at § 404.1522(a). "If we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your [mental] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). *See also Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 435-36 (6th Cir. 2010) (affirming a non-severe mental impairment finding despite claimant's moderate limitations); *Atterberry v. Sec'y of*

11

*Health & Human Servs.,* 871 F.2d 567, 572 (6th Cir. 1989) (upholding a finding that claimant who was "'somewhat depressed'" did not have a severe mental impairment).

Here, the ALJ determined that Rodriguez's mental health impairments were not severe based on the "four broad functional areas . . . known as the 'paragraph B' criteria." (Tr. 571). Included in the four functional areas are the abilities to interact with others and to adapt or manage oneself. (Tr. 572). The ALJ found Rodriguez had no limitation prior to her DLI regarding interacting with others, citing to Rodriguez driving for Uber and appearing alert, pleasant, and cooperative at medical appointments. (*Id.*). He further found Rodriguez had mild impairments regarding adapting and managing herself. (*Id.*). In making this finding, the ALJ noted despite her mental health diagnoses and resulting symptoms, her "mental status examination remained unremarkable showing she remained alert, oriented, cooperative, and pleasant." (*Id.*).

To support this appeal Rodriguez relies primarily on medical records from November 16, 2018, post-dating her DLI. Rodriguez's post DLI medical records are not entirely without value in my review of the ALJ's decision, but the value is significantly diminished. "[P]ost-date-last-insured medical evidence generally has little probative value unless it illuminates the claimant's health before the insurance cutoff date." *Grisier v. Comm'r of Soc. Sec.*, 721 Fed. Appx. 473, 477 (6th Cir. 2018). Rodriguez's post-DLI medical records illuminate the extent to which Rodriguez suffered from depression and anxiety before the DLI when limited signs of distress or recent psychosocial stressors were present. In those scenarios, Rodriguez presented alert, cooperative, and without sleep disturbance, mood disorder, and suicidal ideations. (Tr. 291, 304, 310). However, when a stressor emerged – like a fight with her family – Rodriguez would lose

12

her patience, experience heart palpitations, dizziness, and headaches, and express death wishing thoughts. (Tr. 257-61, 289).

Evidence in the record demonstrates that Rodriguez suffered from depression and anxiety resulting from her husband's death in 2016, prior to her June 30, 2018 DLI. (Tr. 287-87, 289, 303, 310). She cites to records that pre-date her DLI, including appointments with Dr. Osario on April 15, 2017, and CNP Felix on April 3, 2018, where she was prescribed Lexapro and Buspirone for her depression and anxiety. (ECF Doc. 11, PageID 2026; Tr. 289-91, 310-11). Her depression and anxiety led Rodriguez to overeat, have passive death wishing thoughts, and, at times, affected her relationship with her family. Furthermore, the record demonstrates that Rodriguez complained of depression and anxiety arising from her husband's death as early as April 21, 2017 when she reestablished care with Dr. Osario. (Tr. 310). Her grief persists throughout her medical records. (Tr. 310, 289, 406).

Accordingly, the record suggests that Rodriguez's mental health impairments had more than a minimal effect on her ability to work. Indeed, the ALJ found she had mild impairments which would suggest that Rodriguez has crossed the *de minimis* threshold at Step Two.

However, my analysis does not end here, because "'an ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment—either singly or in combination with a claimant's other impairments—does not impose *any* work-related restrictions.'" *Patterson v. Colvin*, No. 5:14-CV-1470, 2015 WL 5560121, at *4 (N.D.Ohio Sept. 21, 2015) quoting *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 WL 871617, at *6 (E.D.Mich. Feb.27, 2015). Thus, the question before me is not whether it was error for the ALJ to fail to find her mental health impairments severe at Step Two, but rather whether

it was error for the ALJ to overlook the non-severe impairments when forming the RFC at later steps in the sequential evaluation.

"When formulating an RFC, an ALJ must consider the combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." *Kochenour v. Comm'r of Soc. Sec. Admin.*, No. 3:14-CV-2451, 2015 WL 9258609, at *6 (N.D. Ohio Dec. 18, 2015) (quotation marks and alteration omitted) citing *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 388 (6th Cir. 2013) ("[T]he ALJ's assessment of residual functional capacity reflects a claimant's functional capacity in light of all his limitations, not just those that are severe."). "Courts within the Sixth Circuit have repeatedly held that 'an ALJ's failure to adequately explain how an impairment affects an individual's RFC may constitute reversible error.'" *Patterson*, 2015 WL 5560121, at *4 quoting *Katona*, 2015 WL 871617, at *7.

 "Where an ALJ determines that non-severe impairments do not result in any work-related restrictions or limitations, the ALJ 'is required to state the basis for such conclusion.'" *Patterson*, 2015 WL 5560121, at *4 quoting *Hicks v. Comm'r of Soc. Sec.*, No. 12-13581, 2013 WL 3778947, at *3 (E.D.Mich. July 18, 2013) (finding that a remand was necessary where the ALJ explained his findings for why a mental impairment was non-severe but failed to consider "combined limiting effects" of claimant's non-severe mental and severe physical impairments).

In the present case, the ALJ stated that he "must consider all of the claimant's impairments, including impairments that are not severe" in making his RFC determination and referenced that Rodriguez had depression, was afraid to go out alone, took medication for her symptoms, and spoke to a psychologist. (Tr. 570, 574). Notwithstanding these statements, the ALJ did not state a conclusion as to why Rodriguez's *mental* impairments did not result in any

14

work-related limitations. Rather, the ALJ detailed Rodriguez's *physical* impairments and how those impairments imposed work-related limitations. (Tr. 573-75). Accordingly, I find remand necessary because it is unclear if the ALJ failed to consider or merely failed to explain why Rodriguez's mental impairments did not result in work-related limitations in determining her RFC. Due to this error, I cannot determine whether the ALJ discredited or merely overlooked the relevant evidence in the record. *See Shrader*, No. 11-13000, 2012 WL 5383120, at *6. In this, therefore, there is error, as the ALJ did not build an accurate and logical bridge between the evidence and his Step Two finding and RFC determination. *See Fleischer*, 774 F. Supp. 2d at 877.

**VII. Conclusion**

For the foregoing reasons, the Commissioner's final decision denying Rodriguez's DIB application is vacated and the case is remanded for further proceedings consistent with this opinion.

Dated: May 10, 2024

Reuben J. Sheperd
United States Magistrate Judge